IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| GARY RAMSEY, Individually and as | § | |
| Independent Co-Administrator of the Estate of | § | |
| THERESE JOANN RODRIGUEZ, Deceased; | § | |
| and RONALD RAMSEY, JR., Individually | § | |
| and as Independent Co-Administrator of | § | CIVIL ACTION NO. 5:18-cv-00944 |
| the Estate of THERESE JOANN | § | |
| RODRIGUEZ, Deceased | § | |
| | § | |
| vs. | § | |
| | § | |
| THE UNITED STATES OF AMERICA | § | |

_____

**PLAINTIFFS' ORIGINAL COMPLAINT FOR DAMAGES
UNDER THE FEDERAL TORT CLAIMS ACT**
_____

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

COME NOW, Gary Ramsey, Individually and as Independent Co-Administrator of the Estate of Therese Joann Rodriguez, Deceased, and Ronald Ramsey, Jr., Individually and as Independent Co-Administrator of the Estate of Therese Joann Rodriguez, Deceased ("Plaintiffs"), and file this Complaint for Damages against The United States of America ("Defendant USA") pursuant to the Federal Tort Claims Act and for cause of action would show this Honorable Court the following:

**I.**

**Parties**

1.    Plaintiffs Gary Ramsey and Ronald Ramsey, Jr. are residents of Texas.

2.    Plaintiffs are the surviving sons of Decedent Therese Joann Rodriguez and, on January 10, 2018, were appointed Independent Co-Administrators in Cause Number PR-08152, in the County Court of Wilson County, Texas.

1

3.     Plaintiffs are proper parties under Texas law to bring a claim for the wrongful death of their mother, Therese Joann Rodriguez.

4.     Defendant The United States of America may be served with process by delivering a copy of the Summons and Complaint via certified mail to each of the following:

    a.     John F. Bash, Esq., United States Attorney for the Western District of Texas, 601 NW Loop 410, Suite 600, San Antonio, Texas 78216, Attn: Civil Process Clerk;

    b.     Jeff Sessions, Esq., Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001, Attn: Civil Process Clerk;

    c.     Department of Defense, 1400 Defense Pentagon, Washington, DC 20301-1400; and

    d.     Dr. Heather Wilson, Ph.D., Secretary of the United States Air Force, 1670 Air Force Pentagon, Washington, DC 20330-1670.

## II.

## Jurisdiction and Venue

5.     This action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq*. & § 1346, *et seq*. for money damages for death that was caused by institutional failures and the negligent or wrongful acts or omissions of one or more employees of the United States government (including any employee or service personnel charged with implementing and making sure existing policies and procedures were followed, any charged with ensuring policies and procedures were adequate and/or responsible for making any necessary revisions or modifications to such policies and procedures, and any whose duties included reporting convictions to national databases) while acting within the course and scope of their office or employment under circumstances where Defendant USA, if a private person,

2

would be liable to Plaintiffs in accordance with Texas law.

6.      This action arises out of an incident that occurred in Wilson County, Texas.  Wilson
County is in the Western District of Texas, San Antonio Division, the district in which
Plaintiffs also reside.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1402(b) because the incident
occurred in Wilson County, Texas.

### III.

### Conditions Precedent

8.      Pursuant to 28 U.S.C. § 2675(a), Plaintiffs timely presented their claims to the United
States by submitting Forms SF-95 to the Secretary of the Air Force, Dr. Heather Wilson,
via U.S. Certified Mail to the U.S. Air Force Claims & Tort Litigation Division, 1500 West
Perimeter Road #1700, Joint Base Andrews, Maryland 20762, on December 4, 2017. (*See*
Forms SF-95 and cover letters attached as Exhibit A.)

9.      Receipt of the claims (Air Force Claim Nos. 18-3929 and 18-3030) by the Department of
the Air Force on December 13, 2017 was acknowledged by attorney Bradford S. Hunt,
Chief, General Torts Branch, Air Force Claims and Tort Litigation Division. (*See* Hunt
correspondence acknowledging receipt of claims attached as Exhibit B.)

10.     As of June 13, 2018, more than six months have elapsed since the claims were presented to
the Defendant USA, and Defendant USA has not made a final disposition of Plaintiffs'
claims.   Accordingly, the claims of the Plaintiffs are deemed denied pursuant to 28 U.S.C.
§ 2675(a).

11.     Plaintiffs have exhausted their administrative remedies under the Federal Tort Claims Act
and have fully complied with the statutory prerequisites for bringing this tort action against
the Defendant USA.

## IV.

## <u>Specific Operative Facts</u>

12.     The preceding paragraphs are incorporated herein and re-alleged as if fully set forth herein.

13.     On Sunday, November 5, 2017, twenty-six (26) innocent people, including Therese Joann Rodriguez ("Therese Rodriguez"), were murdered and twenty (20) others wounded in a mass shooting at the First Baptist Church of Sutherland Springs in Sutherland Springs, Texas.   Plaintiffs' decedent was murdered as she attended Sunday worship service.

14.     It is undisputed that the perpetrator and sole shooter in the incident was former U.S. Air Force Airman Devin P. Kelley (also "the shooter" and/or "Airman Kelley").

15.     On leaving the church, the shooter was confronted by a good Samaritan who shot him twice, once in the leg and once in the chest.

16.     The shooter fled the scene and was involved in a high-speed car chase which concluded in the shooter taking his own life after his car veered off the road.

17.     Plaintiffs allege that while the shooter "pulled the trigger," resulting in Therese Rodriguez's death, it was failures of the United States Air Force ("US Air Force") and others that allowed the shooter to purchase, own and/or possess the semiautomatic rifle, ammunition and body armor he used in the shooting spree, and such failures were a proximate cause, in whole or in part, of the injuries to and death of Theresa Rodriguez.

18.     Years before the shooting in which Therese Rodriguez was killed, then Airman Kelley was court-martialed and convicted of assault against his wife and young stepson.  He was sentenced to twelve months' confinement in a Navy brig in San Diego, California and given a bad-conduct discharge.

19.     That conviction made it illegal for the shooter to purchase or possess a firearm and should have blocked him from ever again purchasing any gun.   As a result of the criminal

conviction, the Defendant USA was required to, amongst other things, enter this information into various federal computer databases advising that Airman Kelley had been convicted of crimes that prevented him from purchasing, owning and/or possessing firearms.   But Airman Kelley was able to purchase an assault-style rifle as a direct result of the US Air Force's admitted, systemic and long-standing failure to comply with the law and its own internal policies, rules, regulations and guidelines.   The shooter then used that weapon on November 5, 2017 to massacre 26 people and wound twenty more.

20.     Legal obligations were long ago imposed on the US Air Force that are necessary to prevent such a tragedy, but the US Air Force did not meet such obligations.

21.     The United States of America is liable for the negligent failures, acts and omissions of the US Air Force, its employees and members of the Armed Forces.

22.     Therese Rodriguez died, and Plaintiffs have suffered and will suffer injuries and damages as a direct and proximate result of the Sutherland Springs shooting.

23.     As a result, Plaintiffs seek all elements of actual damages recoverable by law.

24.     Plaintiff Gary Ramsey claimed $15,000,000.00 in damages in his administrative claim and seeks damages in such an amount here.

25.     Plaintiff Ronald Ramsey, Jr., claimed $10,000,000.00 in damages in his administrative claim and seeks damages in such an amount here.

## CAUSES OF ACTION

## V.

## Negligence

26.     The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

27.     Therese Rodriguez's death was caused, in whole or in part, by the institutional failures of the United States Department of Defense, including, but not limited to, the US Air Force, in

that these entities negligently, recklessly, carelessly and/or egregiously failed to report pertinent criminal arrest and conviction information of the shooter into a federal database, as required by law and which would have prevented and barred the shooter from purchasing, owning, and/or possessing the firearms that he used in the shooting.

28.  The Department of Defense was aware as far back as 1997, and more specifically by at least 2015, that the United States Air Force routinely failed to report such required criminal arrest and conviction information.

29.  As a result of an internal review conducted by the Inspector General of the Department of Defense which uncovered these repeated failures, the US Air Force agreed to take "prompt action to ensure" that convicted offenders are properly reported to the appropriate federal database to prevent them from legally purchasing, owning, and/or possessing firearms.

30.  Despite this notice and call to action, the Department of Defense, specifically including, but not limited to, the United States Air Force, utterly failed in its reporting obligations which was the proximate cause of Therese Rodriguez's death.

31.  The US military, specifically including the US Air Force, designed and implemented policies, procedures, regulations and/or guidelines that were specifically designed to prevent individuals such as the shooter from purchasing, owning and/or possessing firearms and body armor.   It is the failure by the US Air Force to abide by these policies, procedures, regulations and/or guidelines that directly caused this horrific tragedy.

32.  It is undisputed that the shooter was a member of the US Air Force, having been on active duty from 2009 until 2014 and stationed at Holloman Air Force Base located in Otero County, New Mexico.

33.  In 2011, Airman Kelley married Tessa K. Loge, who had an infant son from a previous marriage.   After his marriage, Airman Kelley was arrested for assault upon his wife and

her son, wherein he inflicted serious injuries upon the two, including, but not limited to, fracturing the skull of the infant boy.   He was also charged with pointing a loaded gun at his wife and two counts of threatening his spouse with an unloaded firearm.

34.   Upon information and belief, because of these criminal charges a general court martial was convened and Airman Kelley was convicted of assault on his wife and her son on November 7, 2012.   Due to these convictions, Airman Kelley was sentenced to a year in military jail.

35.   At that time, Airman Kelley admitted striking the infant boy "with a force likely to produce death or grievous bodily harm."   With respect to the assault against his spouse, Airman Kelley admitted that he "hit, kicked, choked and pulled the hair" of his wife.

36.   The couple were divorced while Airman Kelley served his jail sentence in a naval brig located in San Diego, California.

37.   Airman Kelley was also known to have made threats against his superiors in the US Air Force as well as to have attempted to smuggle guns onto the base in violation of Air Force regulations and base standard operating procedures.

38.   Given the nature of the criminal charges pending against Airman Kelley, in the Spring of 2012 the Air Force involuntarily committed him to Peak Behavioral Health Services, a mental facility located in Santa Teresa, New Mexico which has a dedicated unit for US military personnel.

39.   On June 7, 2012, Airman Kelley jumped a fence and escaped from the mental facility.   He was apprehended by local law enforcement later that same day and returned to the facility to await his court martial.

40.   At the time of his apprehension, it was noted by local authorities that Airman Kelley was suffering from mental health issues and that he was a "danger to himself and others."

7

41.    After capture, Airman Kelley was detained at the mental health facility and ordered into pre-trial confinement while awaiting his court martial.

42.    Upon information and belief, during this time, Airman Kelley used computers at the facility to attempt to purchase weapons and tactical gear via the Internet and have those items shipped to a post office box in San Antonio, Texas.

43.    Upon information and belief, the US Air Force was specifically aware that Airman Kelley attempted to make these firearm purchases while a detainee at the mental health facility.

44.    Eventually, in May of 2014, after serving his military prison sentence, the US Air Force discharged Airman Kelley with a "bad conduct discharge."

45.    As with his prior criminal convictions, the US Air Force utterly failed to enter his "bad conduct discharge" into federal databases.  A "bad conduct discharge" following court martial was yet another event that should have disqualified the shooter from purchasing, owning or possessing firearms and ammunition.

46.    Due to the foregoing, and most notably the shooter's assault convictions, bad conduct discharge post-court martial, and involuntary commitment to a mental facility, the US Air Force, specifically including, but not limited to, the Office of Special Investigations at Holloman Air Force Base ("AFOSI"), and/or the HQ Air Force Security Forces ("HAF/A4S"), was required to enter his November 2012 criminal arrest and conviction information into certain computerized databases, specifically including the FBI's Criminal Justice Information Systems ("CJIS").

47.    The CJIS comprises various computer databases, specifically including the National Crime Information Center ("NCIC") database, Uniform Crime Reporting, Fingerprint Identification and the Integrated Automated Fingerprint Identification System (IAFIS) Program which includes both fingerprint and final criminal disposition data.

48.    These are computerized databases ready for access by an authorized entity making an inquiry into an individual's background and for prompt disclosure of information in the system from other criminal justice agencies about crimes and criminals.

49.    Specifically, the NCIC database is accessed for a number of purposes and is one such database that is required to be accessed whenever a person seeks to legally purchase certain firearms.   Certain criminal convictions, specifically including those of which Airman Kelley was convicted, are required to be entered into the NCIC and other CJIS-related databases.

50.    Had Airman Kelley's criminal arrest and conviction and/or bad conduct discharge information been entered, as was required by US Air Force policies, procedures, regulations and/or guidelines, Airman Kelley would have been prevented and prohibited from purchasing, owning and/or possessing firearms and body armor, specifically including the firearm and body armor that he used in the Sutherland Springs shooting.

51.    Significantly, the Department of Defense has promulgated regulations that impose upon the various branches of the military, specifically including the US Air Force, certain reporting requirements when a serviceman is convicted of a crime. *See* DEP'T OF DEF., INSTRUCTION 5505.11: FINGERPRINT CARD AND FINAL DISPOSITION REPORT SUBMISSION          REQUIREMENTS          7,          *available*          *at* http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/550511p.pdf          (last updated Mar. 30, 2017), and subsequent revisions/changes.

52.    It is undisputed and has been readily admitted by the US Air Force in the days following the horrific Sutherland Springs shooting tragedy that Airman Kelley's convictions and criminal history were required to be entered into the NCIC database and/or CJIS system, but for reasons not presently known the US Air Force utterly failed in its reporting

obligations.

53.     It is also undisputed that had the information been entered into these databases by the US Air Force at the time of his convictions in and around November 2012, as was required, Airman Kelley would have been prevented, prohibited and barred from purchasing, owning and/or possessing the firearms and body armor used in this massacre and this tragedy would not have occurred.

54.     The failures of the Department of Defense, specifically including the US Air Force, are not limited to the failure to timely and accurately enter and/or report Airman Kelley's criminal conviction information into the appropriate computer database in November 2012.

55.     In February 2015, the Inspector General for the U.S. Department of Defense conducted a comprehensive review of the failures of the branches of the US military to promptly and accurately input criminal conviction information into the appropriate computer databases, specifically including the NCIC database.  *See Evaluation of Department of Defense Compliance with Criminal History Data Reporting Requirements, Report Number DODIG-2015-081,* dated February 12, 2015 (the "IG's Report").

56.     The IG's Report examined the continuing failures of conviction reporting by the US Navy, US Air Force and US Marines.   Indeed, the Inspector General recognized that, as far back as 1997, the branches of the US military had not consistently submitted the required criminal arrest and conviction information to appropriate federal law enforcement agencies, including criminal information databases. *See IG's Report,* at p. 12.

57.     With respect to the US Air Force, the 2015 study took a sample of convicted individuals from June 2010 through and including October 31, 2012 (as mentioned above, Airman Kelley was convicted in November 2012, just days after the sample period).   During this time frame, the Inspector General found that there were 358 criminal convictions of US Air

Force personnel that mandated reporting obligations.

58.    However, only 248 fingerprint cards were entered into the appropriate database, representing a failure rate of approximately 31%.  With respect to final criminal disposition information regarding these 358 convictions, only 245 final dispositions were reported, representing a failure rate of approximately 32%.

59.    Due to these alarming failure rates (more than 3 out of 10 failures by the US Air Force to report required criminal arrest and conviction information), the Inspector General made certain recommendations to the branches of the US military, specifically including the US Air Force.

60.    The first recommendation was for the US Air Force to submit and enter the missing fingerprint and final criminal disposition information for the sample period into the appropriate computer databases.

61.    Upon review of the Inspector General's Report, the US Air Force "agreed" with this recommendation.  Unfortunately, Airman Kelley's conviction occurred in November 2012, a mere one month outside the sample examined by the Inspector General.

62.    The Inspector General also recommended that due to the high failure rate the US Air Force "take prompt action" to ensure that **all** arrestee information is properly reported and entered in the various criminal history databases.

63.    The US Air Force also specifically "agreed" with the Inspector General's recommendation. *See IG's Report,* at p. 10.

64.    Notwithstanding that the US Air Force was specifically aware in 2015 (and likely well before) that criminal conviction information was not reported more than 3 out of 10 times on average, and despite acknowledging that it would "promptly ensure" that such systemic failures were corrected, the US Air Force utterly failed the general public, and more

specifically Decedent Therese Rodriguez, by failing to ensure that Airman Kelley's criminal arrest and convictions were properly reported.

65.    Despite its specific prior knowledge, the US Air Force utterly and carelessly failed in its reporting obligations which allowed this tragedy to occur and Therese Rodriguez to be killed.

66.    Had the US Air Force done as required, the shooter would not have been able to purchase, own and/or possess the automatic rifle and body armor that he used to slaughter and injure more than 46 individuals.

67.    Plaintiffs' allegations of negligence are not limited to the fact that the US Air Force's failures allowed Airman Kelley to purchase, own and/or possess firearms.  The utterly careless and reckless failures of the US Air Force to satisfy its reporting obligations with respect to Airman Kelley's criminal arrest and convictions resulted in numerous missed opportunities for various local law enforcement agencies to prevent further violence by Airman Kelley.

68.    Upon information and belief, after his bad conduct discharge from the military, local law enforcement personnel made more than 17 visits to the shooter's home on allegations ranging from animal cruelty to domestic violence and sexual assault.

69.    For example, on or about June 7, 2013, Comal County, Texas deputies responded to the shooter's home to investigate a report of "rape by force" allegedly perpetrated by the shooter.

70.    Without information about the shooter's prior convictions, deputies investigated the report for months, but no charges were brought once investigators believed Devin P. Kelley moved to Colorado.

71.    Had the information regarding Airman Kelley's criminal arrest and conviction for

domestic violence been entered, as was required, Comal County law enforcement would have been aware of that information and perhaps been able to bring felony charges under the Texas Penal Code against Devin P. Kelley in 2013.

72.   In early 2014, local police in Texas responded to the shooter's home to investigate reports of domestic abuse of his then girlfriend, Danielle Shields, but charges were not pursued after Shields told responding officers the report was the result of a misunderstanding.

73.   Had the US Air Force reported Airman Kelley's criminal arrest and convictions for domestic violence, local law enforcement would have had reason to further investigate any claim of misunderstanding and perhaps pursued felony charges under the Texas Penal Code against Airman Kelley in 2014.

74.   In August 2014, Colorado law enforcement responded to the shooter's home to investigate claims of animal cruelty allegedly perpetrated by the shooter, resulting in a standoff with police once the shooter refused to come out of the home.

75.   Without information about the shooter's prior convictions, law enforcement issued Devin P. Kelley a citation rather than arresting him.

76.   Had Colorado local law enforcement had information regarding Airman Kelley's violent criminal past, perhaps he would have been arrested and incarcerated in August of 2014.

77.   Had the information regarding Airman Kelley's criminal arrest and conviction been entered, as was required, local law enforcement would have been aware of that information when they conducted various welfare checks at the shooter's home in Texas in the months leading up to the shooting.

78.   Upon information and belief, local law enforcement also visited the shooter's home due to domestic assault allegations.

79.   Had law enforcement known that the shooter was convicted of a prior domestic assault,

they may have properly entered the home and seized any weapons that were visible or pursued felony charges under the Texas Penal Code against the shooter at that time.

80.   As with his military convictions, any conviction for domestic violence after the shooter was discharged from the military would have likewise barred, prohibited and/or prevented Devin P. Kelley from purchasing, owning and/or possessing firearms, ammunition and body armor, including the semiautomatic rifle and body armor used in the massacre.

81.   Based upon the foregoing, the death of Therese Rodriguez was caused, in whole or in part, by the negligence, recklessness, and/or carelessness of the Defendant USA, through the US Air Force, including, but not limited to: that the US Air Force failed to adhere to the regulations, policies, procedures, and/or guidelines issued by the Department of Defense in failing to report the shooter's criminal arrest and convictions to appropriate federal law enforcement agencies and databases, as was required, thereby allowing the shooter to purchase the semiautomatic rifle and body armor used in the massacre.

82.   Had the US Air Force complied with its necessary and mandatory reporting requirements, the shooter would have been barred, prohibited and/or prevented from purchasing, owning and/or possessing firearms and body armor, including the semiautomatic rifle and body armor used in the massacre and thus, the shooting would not have taken place.

83.   Based upon the foregoing, the death of Therese Rodriguez was caused, in whole or in part, by the negligence, recklessness, and/or carelessness of the Defendant USA, through the US Air Force, including, but not limited to the US Air Force failing to comply with Department of Defense regulations, policies, procedures, and/or guidelines, specifically including, but not limited to, *Department of Defense INSTRUCTION,* Number 5505.11 and subsequent revisions/changes, thereby allowing the shooter to purchase the firearm and body armor used in the shooting.

84.     Based upon the foregoing, the death of Therese Rodriguez was caused, in whole or in part, by the negligence, recklessness, and/or carelessness of the Defendant USA, through the US Air Force, including, but not limited to the US Air Force failing to correct known deficiencies in its criminal arrest and conviction reporting obligations.

85.     Based upon the foregoing, the death of Therese Rodriguez was caused, in whole or in part, by the negligence, recklessness, and/or carelessness of the Defendant USA, through the US Air Force, including, but not limited to its failure of the US Air Force, despite its public statements to the contrary, to adhere to or heed the recommendations promulgated by the Inspector General of the Department of Defense concerning its systemic failures to properly report arrest and criminal conviction information.

86.     Based upon the foregoing, the death of Therese Rodriguez was caused, in whole or in part, by the negligence, recklessness, and/or carelessness of the Defendant USA, through the US Air Force, including but not limited to the US Air Force failing to comply with its obligations and duties regarding criminal arrest and conviction reporting.

87.     Based upon the foregoing, the death of Therese Rodriguez was caused, in whole or in part, by the negligence, recklessness, and/or carelessness of the Defendant USA, through the US Air Force, including but not limited to the US Air Force being specifically aware for years before the shooting that it had consistently failed to report required arrest and criminal conviction information but failing to correct these deficiencies and failing to appropriately abide by and follow its own internal procedures regarding criminal arrest and conviction information.

88.     Based upon the foregoing, the death of Therese Rodriguez was caused, in whole or in part, by the negligence, recklessness, and/or carelessness of the Defendant USA, through the US Air Force, including but not limited to the US Air Force creating a dangerous condition to

the public, and specifically to Decedent Therese Rodriguez, by its failure to adhere, comply and/or follow required criminal arrest and conviction information reporting obligations.

89. Based upon the foregoing, the death of Therese Rodriguez was caused, in whole or in part, by the negligence, recklessness, and/or carelessness of the Defendant USA, through the US Air Force, including, but not limited to the US Air Force breaching the duty of care owed to the public generally, and to Decedent Therese Rodriguez specifically, by its failure to report required criminal arrest and conviction information.

90. Based upon the foregoing, the death of Therese Rodriguez was caused, in whole or in part, by the negligence, recklessness, and/or carelessness of the Defendant USA, through the US Air Force, including but not limited to the US Air Force failing to discuss its deficiencies with other branches of the US military and/or other governmental agencies in an attempt to correct these known deficiencies.

91. Based upon the foregoing, the death of Therese Rodriguez was caused, in whole or in part, by the negligence, recklessness, and/or carelessness of the Defendant USA, through the US Air Force, including, but not limited to the US Air Force unleashing on the public a dangerous individual who had the ability to purchase firearms and body armor when he should have been prevented from doing so.

92. Based upon the foregoing, the death of Therese Rodriguez was caused, in whole or in part, by the negligence, recklessness, and/or carelessness of the Defendant USA, through the US Air Force, all of which, individually and/or jointly, proximately caused, in whole or in part, the subject shooting, the death of Therese Rodriguez and Plaintiffs' damages set forth herein.

**NO EXCEPTIONS APPLY**

**VI.**

93.   None of Plaintiffs' claims asserted herein are subject to any of the exceptions to sovereign immunity found in 28 U.S.C. § 2680.

94.   Defendant USA, including the US Air Force and its employees, failed to meet the required reporting obligations as described herein.

95.   Defendant USA, including the US Air Force and its employees, failed to exercise due care in the execution of its duties under the required reporting obligations described herein.

96.   The reporting obligations described herein do not involve discretionary functions or duties.

**DAMAGES**

**VII.**

**<u>Wrongful Death</u>**

97.   The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

98.   Plaintiffs bring this action as the surviving wrongful death beneficiaries of Therese Rodriguez and as Independent Co-Administrators of the Estate of Therese Rodriguez, having been so appointed in Cause Number PR-08152, pending in the County Court of Wilson County, Texas.

99.   This action is brought pursuant to Tex. Civ. Prac. & Rem. Code §§ 71.002-.004, commonly referred to as the "Wrongful Death Act," and pursuant to the terms and provisions of Tex. Civ. Prac. & Rem. Code § 71.021, known as the "Survivor's Act," and any and all other applicable laws including the common law of the State of Texas.

100.   As a direct and proximate result of the negligent conduct and failures of Defendant, Therese Rodriguez died and Plaintiffs have suffered damages.

101.   As the surviving sons of Therese Rodriguez, Deceased, Plaintiffs are statutory beneficia-

ries of Decedent.

102.   By reason of the shooting and the death of Therese Rodriguez, Plaintiffs have suffered past and future pecuniary loss, meaning the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, that Plaintiffs, in reasonable probability, would have received from Therese Rodriguez had she lived.

103.   By reason of the shooting and the death of Therese Rodriguez, Plaintiffs have suffered past and future loss of companionship and society, meaning the loss of the positive benefits flowing from the love, comfort, companionship, and society that Plaintiffs, in reasonable probability, would have received from Therese Rodriguez had she lived.

104.   By reason of the shooting and the death of Therese Rodriguez, Plaintiffs have suffered past and future mental anguish, meaning the emotional pain, torment, and suffering experienced by Plaintiffs because of the death of Therese Rodriguez, Deceased.

105.   The Estate of Therese Rodriguez, Deceased, through its legal representatives, Gary Ramsey and Ronald Ramsey, Jr., is also entitled to bring action on behalf of Decedent for the physical pain and mental anguish she was caused to endure from the time she was shot until the time of her death as a result of the negligence of Defendant.

## VIII.

## <u>PRAYER</u>

WHEREFORE, Plaintiffs pray and respectfully demand verdict and judgment as follows:

a.      That summons and process issue and the Defendant be served with this Complaint as required by law and that Defendant be required to appear and answer;

b.      That Plaintiffs' claims under the Federal Torts Claims Act against the Defendant United States of America be tried to a judge sitting as the fact finder;

c.      That Plaintiffs be awarded the damages sought herein in an amount determined by

the trier of fact;

d.      That Defendant be charged with all costs and other expenses attributable to this

action to the maximum extent permitted by law under the Federal Tort Claims Act;

and

e.      That Plaintiffs be granted such other and further relief as is supported by the

evidence and authorized by law that the Court may deem appropriate.

Respectfully submitted,

THE AMMONS LAW FIRM, L.L.P.

*/s/ Robert E. Ammons*
ROBERT E. AMMONS, Attorney-in-Charge
Bar No. 01159820
Email: rob@ammonslaw.com
April A. Strahan
Bar No. 24056387
Email: april@ammonslaw.com
3700 Montrose Boulevard
Houston, Texas 77006
Telephone:     713-523-1606
Facsimile:     713-523-4159
Email: joy@ammonslaw.com

and

Tim Maloney
Bar No. 12887380
Email: tmaloney@maloneyandcampolo.com
Paul E. Campolo
Bar No. 03730150
Email: pcampolo@maloneyandcampolo.com
MALONEY & CAMPOLO, L.L.P.
926 S. Alamo
San Antonio, Texas 78205
Telephone:     210-922-2200
Facsimile:     210-923-1313

***ATTORNEYS FOR PLAINTIFFS***